No. 20876.

LOWELL D. NEWEY *v.* MYRTLE L. NEWEY.
(421 P.2d 464) and (422 P.2d 641)

Decided May 2, 1966. Rehearing granted May 23, 1966.
Original opinion adhered to January 9, 1967.

STERLING and STERLING, for plaintiff in error.

CHARLES GINSBERG, for defendant in error.

*In Department.*

Opinion by MR. JUSTICE MOORE.

MYRTLE L. NEWEY, to whom we refer herein as plaintiff, brought a divorce action against Lowell D. Newey, to whom we refer as defendant. The plaintiff also sought division of property, alimony, attorney fees and restoration of her former married name of Myrtle L. Mahoney.

Defendant filed an answer and cross-complaint which was later withdrawn by him, and the action was disposed of on March 16, 1961, as a noncontested divorce matter. At that time a decree was entered. The other issues concerning division of property, alimony, and attorney fees were reserved for further hearing. At a much later date, after an extended hearing by one judge (who granted a new trial) and a further hearing by a second judge, plaintiff was granted a judgment for alimony in the sum of $300 per month and attorney fees. Defendant is here by writ of error to reverse the trial court's decision, relying upon an alleged settlement agreement whereby plaintiff, for a consideration of $50,000 and other valuable consideration, released all claims against him.

To afford a proper understanding of this opinion we give the following resume of the facts leading up to the present controversy. Prior to the fall of 1957 the plaintiff had been married four times. Each of her

former matrimonial ventures terminated in the divorce courts. She was by trade a beautician, and by profession a pharmacist. Up to the fall of 1957 she had accumulated a considerable amount of assets. Defendant had been for several years engaged in the insurance business, and during this period of time had also participated in some speculative activity in oil, mining, and other business pursuits. He had become interested in, and had spent considerable time, money and effort in gathering information and data for the creation of a life insurance company, and finally had decided to launch such a venture in the State of Montana. A sales partnership was formed between himself and one John Mellor for the purpose of expediting the sale of stock in the proposed insurance company. This partnership did business as the Montana Securities Company. The defendant brought about the incorporation of the United Reserve Underwriters Corporation which was the underwriting company for the sale of the stock issue of the United Reserve Life Insurance Co., which latter company was also incorporated and organized by him with the assistance of his attorneys. Defendant and John Mellor, as partners of Montana Securities Co., organized a sales force to sell the stock. The stock promotion was a complete success. The United Reserve Life Insurance Co. was thereupon licensed and began selling life insurance in Montana.

In the meantime, and in the fall of 1957, plaintiff age 46 and defendant age 51 entered into a meretricious relationship. They went to Billings, Montana, where they lived together openly as husband and wife. On May 26, 1959, they formalized their relationship with a civil marriage ceremony.

By July of 1960, the promotion of the United Reserve Life Insurance Company was completed and defendant sold his interest therein for the sum of $375,000 to American Pacific Life Insurance Company. The purchase of this stock was negotiated by one Jack Turner

on behalf of the purchaser, and those negotiations were started in June of 1960. Plaintiff and defendant had come to a parting of the ways either some time during the negotiations for the sale of defendant's stock or shortly thereafter. Plaintiff was living in Billings, Montana, and defendant had returned to Denver, Colorado, before the completion of the stock sale.

Jack Turner saw Mrs. Newey several times in Billings, after the aforementioned business purchase was made by the company which he represented. He acted as an intermediary in affecting a settlement between plaintiff and defendant, and testified, *inter alia*, as follows:

"A. I had several conversations with Mrs. Newey, some at her home, some in the Northern Hotel. The one I am referring to is a conversation I had with Mrs. Newey sitting in the Northern Hotel in Billings, Montana.

\* \* \*

"Q. And what was that conversation as near as you can recall?

"A. Well, Mrs. Newey told me that she wanted some money from Mr. Newey, and I asked her what for and she said she wanted a property settlement from Mr. Newey because she felt that she deserved it, and I said, well, I didn't know anything about their personal problems and I would rather not get into it. She said, well, she was either going to get it or she was going to tell all she knew about the company, something that went on, or some things that went on that were not the way it should have been handled. I didn't want to get our company in trouble since we had just invested $375,000 in this venture, and until we had time to check out whether this was true or wasn't true, I wanted to settle the whole affair.

\* \* \*

"A. As near as I can recall, Mrs. Newey wanted $50,000 and a divorce.

400

"Q. Did she make some such statement to you?

"A. She did, sitting in the Northern Hotel at a little cocktail table there.

* * *

"THE COURT: Just a minute. Did you say she said she wanted $50,000 or a divorce?

"THE WITNESS: And a divorce.

The witness then went on to tell that he called Mr. Newey in Denver and had several conversations with him about Mrs. Newey's demands. The following testimony is indicative of what further took place:

"A. At first he agreed to do nothing, until after several conversations and talking to Mrs. Newey, and he finally eventually agreed to give her the money if I would bring the release, the proper release down, or the settlement down with me to Denver, he would then give her the money. That was the arrangement that was arrived at.

* * *

"A. I went back to Mrs. Newey and told her that I had it pretty well worked out, and if she would draw up the property settlement I would present it to Mr. Newey, pick up the check or the cash and —

"Q. As a result of that, did she draw up any agreement or statement of any kind?

"A. Yes. Mr. John Mellor and myself went down to her house and met her at her home. She sat down with a pen and a piece of paper and wrote out a property settlement in her own handwriting.

"Q. I hand you Defendant's Exhibit No. 2 and ask you to state what that is, if you know?

* * *

"A. That's the very paper that Mrs. Newey wrote for us to have typed.

"Q. Now, you say for us to have typed. What was done about that paper which is marked Exhibit 2?

"A. We took it up to our office and handed it to the

girl and told her to type that word for word on a piece of paper, and she did."
Exhibit 2 read as follows:

"July 27, 1960

"I Myrtle Newey hereby agree to receive from my husband L. D. *Pat* Newey $50,000.00 providing he L. D. *Pat* Newey relinquishes all claims of rights he might think he has to any or all property & things I Myrtle Newey solely own in any other state or states which was accumulated by me solely before marrying Mr. L. D. Newey.

"I further agree to forfeit any claims I have on anything Mr. Newey owns as of this date.

Mrs. L. D. Myrtle Newey"

Exhibit 1 was identified as the typewritten copy of Exhibit 2. It bore the following signatures:

| "John L. Mellor | Mrs. L. D. Myrtle Newey |
|---|---|
| Witness | Mrs. L. D. Myrtle Newey |
| "Jack Turner | July 27, 1960 |
| Witness | Dated |
| "R. C. Wade | L. D. Pat Newey |
| Witness | L. D. 'Pat' Newey |
| "Jack Turner | July 28th 1960 |
| Witness | Dated" |

"Q. Now, coming back to Exhibit 2, the signature Mrs. L. D. Myrtle Newey, were you present when that signature was placed upon there?

"A. I was present.

"Q. Calling your attention to Exhibit 1, Defendant's Exhibit 1, were you present when the signature of Mrs. L. D. Myrtle Newey was signed?

"A. Yes, I was. That was signed in her living room with Mr. Mellor and myself present, before we came to Denver.

"Q. The signature of John L. Mellor, opposite Mrs. Newey's name as witness, was that signed in your presence?

"A. That was signed in my presence.

"Q. And by whom?

"A. By John L. Mellor.

"Q. Below that, the signature of Jack Turner, is that your signature?

"A. That is a copy of my signature. I signed that in the presence of Mr. John Mellor and Mrs. L. D. Newey, in her living room.

"Q. Then the lower part of it, the signature of L. D. Pat Newey, were you present when Mr. Newey signed that?

"A. Yes, I was.

"Q. Is that his signature?

"A. That is Pat Newey's signature.

Q. Were you present when R. C. Wade signed as a witness?

"A. I was present when Mr. Wade signed that.

"Q. And is that your signature, Jack Turner, as a witness?

"A. Yes. I also witnessed that signature.

"Q. And these are all on Defendant's Exhibit No. 1, is that right?

"A. Yes.

"Q. Now, what was the occasion of you and Mr. Wade and Mr. Newey signing that Exhibit 1?

"A. We went to the bank to pick up the check. I agreed with Mrs. Newey that I would not turn over this property settlement to Mr. Newey until I had the money in my hand, and that I couldn't do. So we went to the bank to get the check, and we had Mr. Newey's signature witnessed and I and Mr. Wade witnessed it.

"Q. I hand you Exhibit 3. Do you know what that is?

"A. This is a copy of the check that was issued to Mrs. Newey.

\* \* \*

"Q. Calling your attention to the reverse side of the check, where it says, typed in there, 'Payee releases all

claims against L. D. Newey,' was that on the check when you took it?

"A. Yes, that was on the check. Mr. Newey insisted on putting that on the back.

"Q. And what did you do with that check, the original of that exhibit?

"A. I accepted the check, I gave Mr. Newey a copy of the release, and I took the check and another copy of the release and gave it to John Mellor, who subsequently delivered it to Mrs. Newey in Billings, Montana."

Exhibit 3 is a Cashier's Check issued by the Bank of Denver. The record is clear that plaintiff received this check in due time, together with her copy of the release which both she and her husband had signed. The record is further clear that she retained the check for almost thirty days without either cashing it or depositing it, during which time she consulted several lawyers. Plaintiff never admitted that she consulted those lawyers about this check; but in the latter part of August she received a letter from the Bank of Denver threatening to stop payment on the check unless she did cash it. At that time plaintiff admits that she consulted a banker in Montana about the check, and then immediately came to Denver, went to the Bank of Denver, endorsed the check and cashed it.

Defendant's Exhibit 2, together with defendant's Exhibits 1 and 3, constitutes written evidence of what the agreement was between the parties, and as such releases Mr. Newey from all claims. This the plaintiff was fully aware of when she endorsed and cashed Exhibit 3. Plaintiff cannot be permitted to accept the sum of $50,000 and at the same time disclaim any other part of her contract.

In *Rhinehart v. Rinehart*, 52 Wyo. 363, 75 P.2d 390, it was held that a husband and wife, in contemplation of separation or divorce, may by valid agreement between themselves, settle and adjust all property rights growing out of the marital relation, including the wife's right of

dower and claim for alimony, support and maintenance; and that an agreement between husband and wife which provides for alimony or property settlement in contemplation of divorce is presumptively fair, and the burden is on the wife to establish the contrary.

■ The court, in determining the pecuniary provision for the wife upon granting a decree of divorce to her, has no right to disregard a previous contract free from fraud, collusion, or compulsion, and fair to her, entered into between her and her husband in contemplation of a divorce, settling and adjusting all their property rights, including dower, alimony, and support.

"* * * Alimony may be waived. The right to seek alimony may be surrendered for a valuable consideration. * * *" *International Trust Co. v. Liebhardt,* 111 Colo. 208, 139 P.2d 264.

See also *North v. North,* 339 Mo. 1226, 100 S.W.2d 582, 109 A.L.R 1061 (1936).

In *Irwin v. Irwin,* 150 Colo. 261, 372 P.2d 440, this court held that where a husband and wife are competent to enter into a binding contract settling their differences and fixing their rights and duties toward each other, they thereby substitute contractural rights for those they might otherwise assert; and that the judiciary cannot relieve parties to a fair and binding contract from the obligations thereof, or deny them the rights and protections arising from such contract.

■ In the instant case plaintiff, for a consideration of $50,000, released *all* claims against her husband. She is bound by that release and it was error for the trial court, having upheld the agreement as a part thereof, to grant alimony to the plaintiff.

■ In *Irwin v. Irwin, supra,* we held that where parties to a divorce action had settled all their differences by contract, the only duties of the husband are those set forth therein; and there being no authority for the allowance of attorney fees to the wife, the court was without authority to award such fees. In the instant

action the release signed by the plaintiff was sufficient to bar her claims for attorney fees. In addition to that, the undisputed evidence is that the plaintiff in this case had a net worth of $104,157.03. She was well able to provide her own attorneys. Under such circumstances the wife is not entitled to an award of attorney fees to be paid by the husband, and the trial court erred in awarding $2000 attorney fees to be paid by the defendant for the benefit of plaintiff's lawyer. *Henderson v. Henderson,* 104 Colo. 325, 90 P.2d 968; *Peercy v. Peercy,* 154 Colo. 575, 392 P.2d 609.

The judgment of the trial court, for alimony, and attorney fees to plaintiff's present counsel, is reversed.

MR. JUSTICE DAY and MR. JUSTICE PRINGLE concur.

MR. JUSTICE DAY dissenting:

Although I concurred in the original opinion in this case, on rehearing, which was granted, I now dissent to the adherence by the court to the original opinion. It is my contention on reflection, made after the filing of the petition for rehearing, that this court has substituted its judgment for the judgment of the trial court in an area which I believe rests solely with the trier of the facts.

The matter of the property settlement and alimony was tried before two district court judges in the City and County of Denver. Both arrived at the same result. Both determined that there were two issues before the court: (a) the question whether a property settlement had been reached between the parties prior to the filing of the complaint in divorce and (b) whether the agreement reached by the parties also included alimony. Both trial judges found the issues on the question of property settlement in favor of Mr. Newey. Both found that the agreement did not cover alimony and that in the discretion vested in the trial court alimony should have been awarded to the limit of $40,000. One judge

ordered that it be paid at the rate of $1000 a month; the other reduced the payments to $300 a month. Both awards of alimony were to terminate if Mrs. Newey remarried or when $40,000 had been paid, whichever occurred first.

It is my opinion that the sole question in this case is whether the record supports the judgment of the trial court. I think it does.

I, therefore, assert that this case presents no new problems. It is the typical dispute which we have heretofore left with the trial court. I believe the majority has invaded the trial court's prerogative.

MR. JUSTICE FRANTZ joins in this dissent.